For the expressly stated purpose of avoiding the inevitable loss of patent rights, COMMIS has provided the winning statement of patents wherein delaying paying maintenance fees was unavoidable. Now, cases of unavoidable delay can range from those meeting the stringent standard where you have literal unavoidable delay to those meeting the less stringent standard where you have... essentially discretionary statute. Well, the statute does contain the words to the satisfaction of the director. That is correct. It says unavoidable to the satisfaction of the director. However, those words are still subject to the underlying purpose of the statute which was expressly stated by COMMIS to avoid the inevitable loss of patent rights. And so, it is our contention that the director has abused his discretion here because the decision is contrary to the purpose underlying the statute and contrary to all reason and common sense even. In this case, due to a tragic change in circumstances, Mr. Brandt was left completely unable to pay the maintenance fees on his patent. Prior to that change in circumstances, Mr. Brandt had entered into a contract with a third party I.R.I. to commercialize his invention. What you're saying is any time there's an unfortunate, sad situation, the commissioner abuses his discretion unless he finds for that person. No, Your Honor. But what we're saying is that in this case, there is undisputed medical testimony on the record, undisputed evidence of extreme poverty and disability which shows, when you look at all the facts and circumstances here, that he simply could not have paid. So, this is a case of literal unavoidable delay and, in fact, the office has even said that, on the record, they said, we do not contest the medical evidence in this case. The office does not substitute its judgment with a judgment of Mr. Brandt's position. Unfortunately, they did not factor that in to the final decision. Now, if this were a case in which there had been a simple assignment of the patent to I.R.I. in exchange either for a fixed quantity of money or a right to royalties, if any should ensue from the patent, you wouldn't have an argument, correct? I believe that's correct, Your Honor, because then there would be no equitable ownership of the claim on Mr. Brandt's part. Right, so your argument turns entirely on the question of whether the contract between I.R.I. and Mr. Brandt resulted in a breach of that contract by I.R.I. such that Mr. Brandt's latent rights came to the fore, correct? Well, Your Honor, I would characterize it a little differently. I thought you'd say that. We're not trying to ask the patent office, of course, to resolve a dispute between the parties, merely to look at the evidence, which we believe they really have not ever contested that there's equitable ownership. And it's so clear on the record when you look at the original agreement at A101 to A106 in the appendix, the letter at A107, and the lien at A116, that Mr. Brandt, in 1989, he exercised his reversionary right, and he became the equitable owner. At that point, he was entitled to get legal ownership back, and it's only because I.R.I. knocked it back that we do have to discuss this issue. But isn't that, you said you weren't asking the patent office to make that determination. It seems to me your answer then was, well, it's pretty clear that he's entitled to be the record owner of the patent under the contract, and therefore they should go ahead and make that determination. Well, all that we're asking them to do is to review the evidence of record that's been submitted to them, which is what people will do. The point of reviewing it would be to reach a conclusion as to whether he was right or I.R.I. was right in saying he wasn't entitled to the patent, right? Well, our view is that this court doesn't even need to decide it because the patent office actually did not even dispute that evidence. They have never disputed or challenged the declaration of Mr. Carson in which he said that there were equitable rights here that attached. And still, to the extent that they're not resolving a dispute between the parties, but evaluating the evidence to look at whether or not, from Mr. Grant's vantage point, whether or not equitable ownership attached here. And that's consistent with what they're obligated to do under the statute, since the statute's main purpose is to avoid the inequitable loss of patent rights. But the office doesn't, as Judge Bryson said, the office doesn't seem to dispute that he may very well have had equitable rights. But they point out that he made no attempt to pay the maintenance fee at that time or for many years thereafter. And I gather the office didn't hear from him until ultimately this issue arose after many years of lapse of the patent. Well, the only reason why this has even been brought to this point is only through pure serendipity, external factors being involved. Much like in the In Re Matuliff case where you had the Wright brothers enforcing their patent and the patent application of Matuliff was brought to light. Here that also happened, a reporter publicizing Mr. Grant's case and others getting involved, a charitable attorney getting involved in the case. And so ultimately what we have here is a case where it would be contrary to all reason to ignore the equitable ownership. It's a well-held maxim that equity considers as done that which ought to be done. And in this case, Mr. Grant would have been the legal owner, but for IRI not transferring the legal ownership sooner, they ultimately did transfer the legal ownership. It's just for many years they resisted doing it and they also did not pay the fees. So they complicated this situation. However, consistent with the express purpose underlying the statute, it's our contention that you have to look through to what Mr. Buran's situation is and the circumstances of Mr. Buran to avoid that inequitable loss of patent rights that will result. And when you look through to his circumstances, you see that all the facts and circumstances show that this is a case of literal unavoidable delay. Now, where we think the lower court went wrong is that they failed to recognize the significance of that equitable ownership and also failed to recognize that this is a case of literal unavoidable delay. The court really sort of turned this court's holding and Ray V. Lehman on its head. In Ray V. Lehman, there was no equitable owner. In this case, there is an equitable owner. There is a party with equitable rights. And again, the evidence, it doesn't seem that the office had really disputed it. They just said that they will not judge disputes between parties. But again, unlike in Ray V. Lehman where you have an agency relationship, here you have an express contract with an express agreement that clearly states that anyone can see. And the Patent Office is certainly capable of looking at that evidence and making that judgment. Sounds like your remedy is with IRI. No, Your Honor, not at all, because all we're asking the Patent Office to do is to review the evidence of record to make sure that they consider the appropriate argument. But you're saying they breached an obligation. No, no, they were not even… The Patent Office didn't breach an obligation. We're not even saying that they breached an obligation, in fact. All we're saying is that under this agreement, Mr. Brandt did what he had to do. All he had to do under the contract was provide notice, which is at 8107, and file a lien at 8116. It's his plaintiff's day to see. So he exercised that and became the equitable owner. And it would be penalizing him for this technicality of the fact that he was not the assignee of record. But it is his right here to be lost. And so you should look at the party that stands to lose here, which is Mr. Brandt, the party who exercised his right, clear on the record, and the declaration further supporting that, which was not contested from what we can tell on the record.  We don't care about I.R.I. or what they did. We focus on Mr. Brandt, his circumstances, and his loss here to satisfy congressional intent. Maybe that was the problem. Mr. Brandt didn't care about I.R.I. Well, Mr. Brandt was a man who became… Who had the title. I.R.I. had the title, and it should have been transferred back to Mr. Brandt, and ultimately was Mr. Brandt was a man whose very reason, his very ability to reason was challenged. The medical evidence is very clear. On the record, the medical evidence shows, and this is undisputed, again, this is undisputed, Mr. Brandt, a physician, has said that he is so mentally ill as to be considered completely disabled, unable to engage in proceedings before the patent office alone. And so you have a person who is in a situation where his very ability to reason is compromised. And as a result of this, he was also in extreme poverty. He simply could not afford to pay. He could not affect payment of a maintenance fee, which involves having to take some affirmative action. He could point out to I.R.I. its obligation to pay. But again, a person under this severe mental illness seemed to have been overlooked. Didn't the court find that he engaged in some other business during that period of time? There was a period of time, sort of this trigger event in 2001, which he fortuitously discovered that this lapse had occurred and that he engaged, and he made a lot of noise. I mean, please review the letters in the record that show the type of things he did, but these are not the efforts, again, that are well-directed efforts of a person completely of reason. Applying a reasonably prudent person test when you ignore the circumstances of a person seems to be arbitrary. In particular, it's particularly troublesome when you ignore a person whose variability to reason is challenged. His rationality is compromised. Was he mentally incapacitated from 1992 when he began receiving medical treatment all the way through 1994? That's correct, Your Honor. He is, to this day, mentally incapacitated. So from before 1992, when he was first diagnosed, he is considered to be completely incapacitated, unable to work, completely unemployable, could not generate an income. And again, I think his mental disability really coming in here and challenging the situation where you have... And the office, again, has not contested that he is completely disabled. They came up with a very arbitrary requirement saying, well, he's not completely disabled, but we don't see total incapacitation here because he wrote a bunch of letters. But let me make sure I have the right contractual language in the contract between Mr. Berant and IRI. Are we talking about the language on A104? Yes, I believe that's correct. That's the only provision that's paragraph, what is it, number 13? Yes, that's correct, Your Honor. And that talks about IRI giving notice that it will no longer provide funds, dot, dot, dot? Yes, Your Honor. Where do we have rights to Mr. Berant spelled out? Well, it says here that if Mr. Berant gives notice to IRI... Where's that? This is acquisition rights shall be exercised by giving written notice, okay. Exactly, and then it requires also that he file a lien with respect to the property rights at the very end there of that paragraph. Well, that all seems to come after the first sentence which talks about IRI giving notice. What are the acquisition rights? And I believe the correspondence does show that they were not, they had indicated to him that they were no longer going to fund the project. And so once they... So that was the paragraph 2 trigger? Yes, yes. And the project is not substantially completed. Now was this vis-a-vis the patent that had not yet, I thought that the patent had already issued at the point in which... It issued in 1990 after the exercise of the repurchase rights. Okay, so the exercise of the repurchase rights occurred when? In 1989, March of 1989. And the declaration of Mr. Carson at A104 to A107 also provides further detail on the analysis that has gone through. And we do not believe that the patent office has even contested that. I see I've been brought to my low point. You are. Let's hear from the commissioner or the director. Thank you, Your Honor. Thank you, Mr. Yarnell. Ms. Kelly. Good morning, Your Honors. This case is very simple. Under this court's guidance in Ray, the unavoidable delay determination focuses on the party responsible for payment. Both parties agree. The person responsible, the entity responsible for payment of the first issue fee in the 406 patent was IRI. The USPTO believes that IRI was responsible because it was the legal owner. Mr. Burant has indicated that he relied on IRI to make payment. And the judge made findings on this matter. So both parties agree IRI was responsible for payment. Yet there's no evidence in the record that IRI ever took any steps to make payment of maintenance fees in the 406 patent. In fact, as Judge Hilton found, quite the contrary. The evidence indicates that IRI intentionally let the 406 patent expire prematurely. You know, Ms. Kelly, it troubles me about this. Here we have a request that plainly is a matter of equity. The inventor and the people who are supporting the research don't seem to have been on the best of terms. There was not cooperation or collaboration apparently after a certain point. Perhaps the promise of the invention wasn't fulfilled. Perhaps Mr. Burant was ahead of his time with his invention. Whatever the reason, it lapsed for lack of payment of maintenance fees. Now why shouldn't the office allow that to be corrected? It seems to me, looking at the briefs, the office says, well, somebody may have intervening rights. Somebody may have relied on the lapse, because there is a statute that provides for intervening rights. But throughout all of this, it looks because the office does not challenge the mental state, the medical evidence, the equitable ownership, or the points on which Mr. Burant is relying. Is this, in fact, a case of it's just too long? You can't revive a patent after a decade, whether or not someone is relying on it? Actually, if you look at arguments of equity, equity is involved when our contract isn't going to save your case. And in the three cases that Mr. Burant relies on finding some sort of equitable title in a patent case such as this, all three of those cases involve some sort of fraud. Futures, can be quid, and total containment. But the office hasn't said, decided as a matter of law, you did or did not have equitable title. And therefore, since you did not have equitable title, you had no right at all, and therefore you have no right to revive. I think a correct characterization of the office's decision is this. First, under Wray, we looked at a party responsible. That was IRI. IRI didn't, there's no evidence that IRI took any steps to make payment in this case. They don't say they did? Pardon? No one says they did. Right. Agreed. Both parties are, I think, agreed on that point. Now, if we instead, and the director did make findings on this, as did Judge Hilton. If we now were to take your argument of best case, and we're looking at your activity, what did you do to ensure timely payment? Mr. Burant admits in his declaration, he did nothing. He did nothing for seven years to, from the time the 406 patent expired prematurely until 2001. But wasn't he mentally incapacitated? Even if we look at the period of time before that, Mr. Burant admits that he relied on IRI to make payment. Now, the 406 patent was filed in 1988. Mr. Burant was still mentally competent then. He still had finances. As the record indicates, he had an attorney at that time. He was sending correspondence from his attorney to IRI. During that time frame, Mr. Burant, he admitted in his declaration and in letters to IRI, I know you've let three of my other patents expire. I know that you, and at some point, I know you've stopped paying your attorney. And yet he relied on IRI, these same people, to make payment. So during the time he had money and he was competent, he did nothing. He took no steps to ensure timely payment. Well, we don't know if he had money. Well, we do know that everything seemed to go wrong for him. And the real question is... That was after, everything seemed to go wrong after the 406 patent expired. Well, I don't think that the record is so precise as to the fact that he was rich before he became poor and that he was perfectly competent before he lost that competency. What I'm trying to explore is whether, in fact, there's supposed to be some sort of benevolence in the exercise of discretion. In fact, is there supposed to be, and therefore that being the reason for the statute in the first place, that allows the director to receive late payment with no time limit in the director's discretion. I'm trying to understand just where that discretion is. Again, there are hints all around that, well, we're now protecting Honda and others who are using this invention from an assault by the inventor if he revives the patent. All of these are just kind of casually mentioned. I'm just trying to understand where this discretion, who in fact is supposed to be protected by the revival statute. Well, the revival statute for reinstating expired patents protects two parties. It protects both the patentee and the public. There is a statute for intervening rights, so by statute the public is protected. Well, I gather these patents have expired or are about to, as to that that, again, is not really explored. Well, Congress, I would assert that Congress did not believe that intervening rights alone would protect the public. For example, Congress had two statutes in play. You have two years, the patentee has two years in which to try to reinstate a prematurely expired patent under the lower unintentional delay standard. So Congress built in some leeway into the statute. He's not invoking that statute. Pardon? That's not the statute that he's invoking. Right, because his delay occurred 11 years later, so he's well outside that sort of built-in cushion by Congress. So what happens is, in those intervening years, you have Honda and probably other motor companies now relying on that fact that for so many years... But there's nothing in the record about reliance, is there? Yes, there is. If you look to the Honda letter, which is in the record at page 1443, Honda says, It appears that your dispute is with IRI, not with Honda. According to the information you have supplied us, IRI was the owner of the 406 patent until recently. IRI abandoned your project in 1991 and failed to pay the fees due in 1994 and 1998. Because of IRI's intentional abandonment of the project and the many years that have passed, it seems unlikely that the USPTO will reinstate the 406 patent. The standard you will have to satisfy for reinstatement now, unavoidable, is very difficult to satisfy. Perhaps you have some reports against IRI. But what does that have to do with whether or not Honda has intervening rights? They don't say they're practicing this technology? They don't say they relied on the apparent abandonment? I believe that in theory he says that IRI did rely on him. Honda relied on him back. That IRI was the legal owner under this court's guidance and reign. You look to the party responsible for payment. Again, Mr. Brandt concedes he relied on IRI to make payments. So there's no dispute as to who was responsible for payment. Isn't your answer that this isn't an intervening rights case? It's a 41C1 case relating to whether the director has the discretion to make the determination, and he made it. Yes, that's another way of answering the question, and probably much more to reply. But the reliance isn't part of that statute? The reliance of other parties isn't part of that statute? No, it is not expressed as part of that statute. But if in fact Honda had said in this letter, which they did not say, that we relied on the abandonment of those patents and felt this technology was in the public domain and therefore used it, is that a factor in the commissioner's, the director's exercise of discretion in terms of protecting the public who is relied? I think that's an interesting question. We'll talk about it. It is a very interesting question. But under this court's guidance in May, and based on the evidence before this court, the director found that there just simply wasn't any evidence, whether we look at IRI, whether we look at Mr. Buran's activities, that anyone took any steps to ensure timely payment. But isn't your argument that we know it's assigned to the director as a matter of discretion, that the issue is whether that discretion was abused, not whether it was exercised in the way that someone else might have exercised it? Well, under the standing review, this was actually something that we discussed in our office. There isn't some sort of clear statement from this court which standard applies, whether it's arbitrary and capricious or whether it's abuse of discretion. We would say that we went under either case. We would say the scat finding by the director was not arbitrary and capricious and the penalty laid down was not an abuse of discretion. But the statute mentions discretion. You're talking about the APA standards of review, right? Correct. But this is explicitly a discretionary statute. Right. The APA outlines two sorts of discretion and then the statute Congress built into 41C that this determination lies with the director, that the director has the discretion to decide these sorts of petitions and just determine whether unavoidable delay exists. And I would assert that the director did not abuse that discretion. But there is no sort of strict guidance from this court or any other court which standard of review specifically applies. I would guess that the statute, that precedent decision is rife with APA discretionary standards. That's what we would assert. Do you think that there are any circumstances in which the legal title owner had obtained legal title through fraud or other means that would lead the director to have an obligation to look behind the legal title owner? I'm thinking about the earlier opinion, of course, of Judge Hilton. Futures, I think, was the name of it. What's the office's position on that? That's not the question. I understand. I understand. But having said that, what's your position? It may be the case that we would find some sort of equitable title assistant. It wasn't fraud in this case. And we rely on this court's guidance in Ray. And we believe that Ray controls. Whether Ray overrules Judge Hilton's earlier decisions, that's what I'm asking really. What I'm asking is to you, is your office's position that you think the director would have an obligation in a fraud-type case to look behind the record owner issue or not? I think... I would have to say no, and here's why. Because it would be inadministrable. Because the other party isn't there to represent themselves. You have an allegation of fraud. You would have an allegation of fraud. The other party isn't there to defend themselves against that allegation. And as we know of any other sort of trier of fact, the stakes are higher when fraud is alleged. And certainly for the PTL to conduct some sort of determination ex parte whether fraud exists or not, I just don't think that that would be a fair determination. And we certainly don't have the authority from Congress to do that anyway. And again, there's no evidence that any fraud is in this case. I understand. Thank you. Okay. Thank you, Ms. Kelly. Just briefly, your honors. Just to clarify one point. We don't agree that I.R.I. was the responsible party in this case as was characterized by the Patent Office. We think that that characterization would turn Ray D. Lehman on its head. Ray D. Lehman was in the spirit of equity in a situation where you did not have bifurcation of rights between a legal and equitable title holder. So this case is very different. It's not inconsistent with Ray. And it's actually consistent with the spirit of Ray and the spirit of equity and fairness looking to the responsible party. So that was really in the protection of a patent holder. And we're asking this court to do the same thing here, offer the same protection under the extraordinary circumstances of this case. Very unique circumstances. You have to go back to 1877 for us to find a case that has the closest type of circumstances with Smith v. Goodyear. But accepting your premise about equitable ownership, how do you get around the decade of no proffer, no attempt to pay the fee late? That's based on his complete inability to pay due to his extreme poverty and disability, particularly a mental illness that compromised his ability to reason. And that is undisputed on the record. The Patent Office has not disputed it. And by not disputing it but ignoring it, that in itself is an arbitrary application of the reasonably prudent person test. And in fact, we think that this rises to a higher standard than reasonably prudent person. This actually rises to literal unavoidable delay because his extreme poverty completely precluded him from being able to pay in this case. And that, combined with the complicated factor of his mental disability, is what led this to happen. And it was only through serendipity that ultimately the fee was paid by another party, money put up by a charitable attorney, taking up his cause. So these are extraordinary circumstances. Mr. Grant did not sleep on his rights here. He became mentally ill, suffered a change in circumstances, and that's why we believe it is appropriate to reverse the situation. Thank you very much. Thank you, Mr. Yarnell and Ms. Kelly. The case is taken under submission.